UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>GEOSYN MINING, LLC, CALEB JOSEPH WARD, and JEREMY GEORGE MCNUTT,<br><br>    Defendants. | Cause No.   4:24-cv-00365 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against Geosyn Mining, LLC ("Geosyn"), Caleb Joseph Ward ("Ward"), and Jeremy George McNutt ("McNutt") (together, "Defendants") and alleges as follows:

### SUMMARY OF THE ACTION

1. Between November 2021 and December 2022, Defendants engaged in an unregistered and fraudulent securities offering through Geosyn, a crypto asset mining and hosting company founded and controlled by Ward and McNutt. Together, Defendants raised over $5.6 million from approximately 64 investors through the sale of investment contracts called "Client Services Agreements" ("CSAs"). Under the terms of the CSAs, Geosyn claimed it would purchase, maintain, and operate crypto asset mining machines and then distribute the mined crypto assets, such as bitcoin, to the investors for a fee.

2. However, while soliciting investors, Defendants: (a) falsely claimed that Geosyn had favorable contracts with electricity providers which enabled Geosyn to operate the crypto asset mining machines profitably; (b) failed to disclose to new investors that they never

1

purchased mining machines (or brought mining machines online) for some of the previous investors; and (c) failed to disclose that Geosyn was not providing the services that it claimed in its offering documents, such as allowing investors to personalize their crypto mining strategy or providing 24/7 onsite monitoring of the mining machines. Further, of the investor funds raised, Ward and McNutt misappropriated approximately $1.2 million for personal use and paid approximately $354,500 to investors in purported mined bitcoin distributions, while admitting in messages to each other that they needed to *buy* bitcoin to fully fund distributions.

3. By reason of this misconduct, the Defendants violated, and unless enjoined will continue to violate, the antifraud and registration provisions of the federal securities laws. In the interest of protecting the public from further violations, the SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, civil penalties and all other equitable and ancillary relief the Court deems necessary and proper.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)]. This action involves the offer and sale of investment contracts, which are specifically identified in the definitions of "security" under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. The Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

5. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Certain of the transactions, acts, practices, and courses of business constituting violations of the federal

securities laws occurred within this district.  Further, at the time of the violations alleged in this matter, Geosyn had its principal place of business in this district, and both Ward and McNutt resided in this district.

## DEFENDANTS

6.  **Geosyn** is a Texas limited liability company offering crypto asset mining and hosting services.  Ward and McNutt formed Geosyn in August 2021 in Fort Worth, Texas.  Geosyntek Holdings, Inc. ("Geosyntek") is the parent entity and managing member of Geosyn.  Neither Geosyn nor its securities are registered with the Commission.

7.  **Ward**, age 40, previously resided in Fort Worth, Texas, but relocated to Smyrna, Georgia in or around 2023.  During all relevant periods, Ward was the president, Chief Executive Officer ("CEO"), and co-founder of Geosyn.  During the Commission's underlying investigation, Ward asserted his Fifth Amendment privilege against self-incrimination and refused to testify.

8.  **McNutt**, age 35, resides in Weatherford, Texas.  McNutt co-founded Geosyn and served as its Chief Operating Officer ("COO") from January 2022 to October 2022, when he resigned.

## FACTUAL ALLEGATIONS

A.  **Background**

  1. *Crypto Assets and Mining Technology*

9.  As used herein, the term "crypto asset" generally refers to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

10.  A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  These systems typically rely on cryptographic techniques to

secure recording of transactions.

11. The capitalized term "Bitcoin" refers to the public ledger which supports Bitcoin blockchain technology; lower-case "bitcoin" refers to the crypto assets created by and electronically stored in the Bitcoin blockchain.

12. Blockchains typically employ a "consensus mechanism" that, among other things, aims to achieve agreement among users as to which ledger transactions are valid, when and how to update the blockchain, and whether to compensate or "reward" certain participants for validating transactions and adding new blocks.

13. One prevalent consensus mechanism, called "proof of work" and used by protocols such as Bitcoin, involves a network of computers expending computational effort to guess the value of a predetermined number. The first computer to successfully guess this number earns the right to update the blockchain with a block of transactions and is rewarded or compensated with the blockchain's native crypto asset. The compensation can come from fees paid by those transacting on the blockchain as well as through newly created amounts of the blockchain's native crypto asset. Participants who undertake validating activities are known as "miners."

14. Typically, proof of work miners are more likely to earn rewards when they run large "farms" of mining equipment with little or no downtime. This, coupled with the computationally intensive proof of work consensus mechanism, requires a great amount of electricity. Lower operational costs, such as lower electricity costs, result in increased profit margins.

15. "Hosting" generally refers to a third party's provision of facilities and infrastructure to house, maintain and operate crypto asset mining machines on behalf of other miners.

### 2. *Geosyn's Founding*

15. Ward and McNutt met sometime around 2017 or 2018. At the time, Ward ran an oil-and-gas mineral rights business and hired McNutt as an acquisition agent. The two worked together in this capacity until 2020, when they began exploring alternative business opportunities.

16. In mid-to-late 2021, Ward and McNutt founded Geosyn with the purported aim to offer investors the ability to profit from bitcoin mining by outsourcing to Geosyn the technical expertise, crypto asset miner procurement, and management of a complex crypto asset mining system.

17. Ward and McNutt held the titles of CEO and COO, respectively. While their roles overlapped, Ward was more heavily involved in investor solicitation, and McNutt managed Geosyn's day-to-day operations.

18. Geosyn rented two commercial spaces to operate its business and to house the crypto asset mining machines that it was purportedly going to purchase, maintain, and operate for investors. The first facility was located in downtown Fort Worth, Texas (the "Magnolia Location"), and the second facility was located in a rural area northwest of Fort Worth (the "Springtown Location"). At its height in 2022, Geosyn had approximately 12 employees.

### 3. *Soliciting Investors*

19. Geosyn obtained the majority of its investors through word-of-mouth. Most investors were individuals, and not all were accredited. Although Ward primarily led the solicitation efforts, McNutt and other Geosyn employees also directly solicited investors.

20. Geosyn conducted a general solicitation of investors through its website (https://geosynmining.com/) and social media accounts. Ward, McNutt, and Geosyn employees working under the Defendants' directions set up and managed social media accounts for Geosyn

on Twitter, Telegram, Facebook, LinkedIn, and Reddit and used those accounts to advertise their mining business, to showcase their participation at crypto asset conferences, to disseminate facility development photos and progress updates, and to share crypto asset industry news. Geosyn also created a YouTube channel, on which it posted informational videos about crypto asset mining. Ward led the marketing efforts, including co-managing the Geosyn website and overseeing Geosyn's "marketing department" employees.

21. In total, from at least November 2021 through December 2022, Geosyn raised approximately $5.6 million from approximately 64 investors in 18 states and three foreign countries.

### 4. *Offering Documents*

22. Defendants provided investors with the following documents: (1) an investment contract that Geosyn called a CSA; and (2) an Excel file, which showed projected investment returns for the various mining machines that relied heavily on speculative increases in the value of bitcoin ("ROI Projections"). At least some investors also received a one-page document summarizing the investment ("Summary Page") and an investment deck with a flow chart identifying the steps from an initial investment with Geosyn to the investor receiving profits in a crypto asset wallet ("Flow Chart"). Ward and McNutt collectively authored the CSA and Summary Page, and Ward was the sole creator of the ROI Projections.

23. When signing the CSAs, Geosyn's investors specified the number and model of mining machines that they wanted Geosyn to purchase on their behalf and agreed to pay Geosyn a 15% "procurement fee" above the cost of the mining machines. In exchange for the investment, Geosyn agreed to purchase and run crypto asset mining machines on the investors' behalf and to pay investors a return of profits in the form of monthly crypto asset distributions, minus deductions for Geosyn's 7% hosting fee, mining pool fees, and electricity charges. For

investors who did not provide separate crypto asset wallet addresses, Geosyn also provided electronic tablets with crypto asset wallets already installed to receive mining distributions.

**B.     The Defendants' Misrepresentations and False Statements**

24.     Through Geosyn's offering documents, Defendants claimed they would provide competitive crypto asset miner hosting services through expertise and economies of scale, such as connecting their machines to crypto asset mining pool networks to increase their chances of earning mining rewards. However, almost everything that Defendants represented about Geosyn's miner purchases and operations contained some element of falsity, as discussed below.

   *1.   False Statements About Electricity Contracts*

25.     Profit margins in the crypto asset mining industry center on maintaining low energy costs. Consistent with this market reality, Ward and other Geosyn representatives falsely represented, through the ROI Spreadsheet and in some instances through statements made directly to investors in conversations, emails, and text messages, that Geosyn had obtained commercial electricity contracts at $0.045 to $0.048 per kilowatt hour ("kWh"). Similarly, the Summary Page claimed that Geosyn's investors benefitted from "wholesale power pricing, which makes mining bitcoin more profitable." Geosyn's low electricity cost was material to investors.

26.     In reality, Geosyn's actual electricity costs did not benefit from "wholesale power pricing" and, at times, more than doubled the represented rates. At the Magnolia Location, Geosyn's landlord paid the building's entire electricity costs and billed Geosyn for its pro-rata share. Between February and November 2022, Geosyn's electricity costs at the Magnolia Location ranged as high as 40-50% above the $0.045/kWh purported cost represented to investors. Despite this knowledge, Ward and McNutt continued to provide the Summary Page and ROI Projections when soliciting new investors.

7

27.     At the Springtown Location, Defendants fared even worse. On behalf of Geosyn, McNutt's mother signed a one-year contract with an electricity provider in April 2022 for a fixed base rate of $0.084743/kWh which, with delivery charges, was more than double the cost that Geosyn continued to represent to investors. Two days before McNutt's mother signed the electricity contract, McNutt and Ward exchanged text messages acknowledging that the actual electricity rates were well above the $0.045/kWh rate represented to investors. In those messages, Ward discussed the idea of raising the electricity cost in the model projection that he provided to investors to $0.065/kWh. But neither Ward nor anyone else at Geosyn ever changed the model projection or stopped citing the false $0.045/kWh rate.

28.     In particular, Geosyn falsely told investors that, as a result of its supposed low-cost electricity contracts, it could make a profit so long as the price of bitcoin remained in the $9,000–$15,000 range. Yet, even though the price of bitcoin has not fallen below $16,000 since 2020, Geosyn was unable to make a profit because it did not have the favorable electricity contracts that Defendants touted to investors.

### *2.   False Statements to Investors about Miner Purchases and Operations*

29.     Defendants lied to investors about how Geosyn would operate the mining machines. In the Flow Chart, Geosyn represented to investors that it would purchase, set up, and begin to run mining machines within three to four weeks of an investor executing a CSA. Similarly, the Geosyn website stated that machines would generally come online within six weeks of investment. Once the mining machines were online, Geosyn's CSA and website also promised investors 98% guaranteed run time and that Geosyn would provide necessary maintenance and 24/7 site monitoring and security for the mining machines. In the Summary Page, Geosyn also represented that investors could personalize their mining strategies by selecting which specific crypto assets to mine.

30. On March 15, 2022, Geosyn issued a press release in which Ward is quoted as falsely stating that, within its first month of operation, the Magnolia Location was at "full capacity," prompting Geosyn to open the Springtown location to host additional mining machines.

31. Out of the approximately 1,400 machines that Geosyn entered CSAs to purchase, Geosyn, as Ward and McNutt knew, failed to purchase about 400 mining machines and never brought most of the purchased mining machines online.

32. As for the mining machines that it did procure and turn on, Geosyn did not allow investors to personalize their mining strategies. Instead, Geosyn rejected investor requests to mine any crypto asset other than bitcoin.

33. Geosyn also did not provide adequate security, and experienced two break-ins at the Springtown Location.

### 3. False Statements about Profitability and Lulling Payments

34. Ward continued to solicit additional investments through periodic emails, though none of the investors ultimately decided to invest additional funds beyond their initial investment amounts.

35. To make investors believe that their mining machines were operational and profitable when they were not, Geosyn made periodic bitcoin distributions to investors at least as late as February 2023. Geosyn also publicized distribution payments in its March 15, 2022 press release, touting that Geosyn made its first bitcoin distribution to investors on February 22, 2022.

36. In total, Geosyn only collected approximately $320,000 from bitcoin mining. But Geosyn distributed approximately $354,500 in bitcoin to investors (this number does not take into account Ward's and McNutt's other misappropriations, as discussed below). To make up for the shortfall, in part, Geosyn distributed to its investors bitcoin that McNutt purchased and

sent to Ward. In text messages exchanged in June and July 2022, McNutt and Ward expressly discussed their scheme to purchase bitcoin to fund investor distributions.

37. Geosyn also distributed bogus documents to investors to create the appearance of profitability. Ward prepared and sent investors monthly distribution statements showing fabricated mining production rates and profits for Geosyn and for the clients' purported shares of the production. The monthly reports included fabricated deductions for: (a) electricity costs, calculated at the understated $0.045/kWh rate; (b) mining pool fees; and (c) Geosyn's 7% hosting fee.

### C. Defendants Misappropriated Investor Funds.

38. Defendants directed investors to send money to Geosyn's bank accounts to purchase their investment contracts. Investors wired their funds or mailed checks, which were deposited into Geosyn's accounts. In a few instances, investors paid with bitcoin transfers. Because Ward and McNutt controlled Geosyn's operations and its bank accounts, they were able to move investor funds as they wished. Ward and McNutt both had access to and control of the Geosyn company credit card, which was paid from Geosyn bank accounts.

39. Ward misappropriated approximately $402,455.35 from Geosyn in the form of cash withdrawals, bank transfers, and company credit card charges. Ward used the investor funds for a variety of personal expenses and items, including meals and entertainment, business expenses unrelated to Geosyn, and other items.

40. McNutt misappropriated approximately $862,095.13 from Geosyn in the form of cash withdrawals, bank transfers, and company credit card charges. McNutt used the investor funds for a variety of personal expenses and items, including vacation travel, construction materials, personal legal fees, firearms, wrist watches, and other items.

41. The offering documents did not authorize Ward or McNutt to use investor funds

for personal use, and the Defendants did not disclose that any investor funds would be used for Ward's and McNutt's personal benefit. To the contrary, under the terms of the offering documents, investor funds were to be used to purchase crypto asset mining machines, and an additional 15% fee was added for Geosyn's operations. The statements in the offering documents about how the Defendants intended to use investor funds were false and misleading.

42. To maintain a façade of success, Ward and McNutt attended several crypto asset-technology conferences in 2022 and spent tens of thousands of dollars on flights for themselves and Geosyn employees, luxury accommodations, nightclubs, and other entertainment venues.

43. At Ward's direction, McNutt charged approximately $20,000 to his Geosyn credit card to pay for Ward's Las Vegas nightclub wedding celebration. Additionally, from June to August 2022, McNutt charged approximately $49,000 on his Geosyn credit card in connection with a family trip to Disney World. The charges included payments for Disney World tickets, Disney World vendors, an Airbnb rental, and airfare. Finally, as Geosyn's operations ground to a halt in 2023, Ward liquidated the Geosyn crypto asset wallet, and kept about $57,000 for himself.

44. At one crypto asset conference in June 2022, McNutt was involved in a car accident, and he and another Geosyn employee were separately arrested for drunk driving ("DUIs"). Subsequently, Ward and McNutt authorized Geosyn to use investor funds to pay approximately $22,000 for a breathalyzer device and for other expenses related to the DUIs and consequent criminal charges.

**D.      The Unraveling of the Geosyn Scheme**

45. In late 2022, Defendants' scheme began to unravel as new investor funds dried up. Geosyn received its last new-investor funds by December 2022.

46. With no new investor funds to finance Geosyn's operations, Ward blamed

McNutt for the failing business. Around October 2022, Ward accused McNutt of embezzling from Geosyn, and on October 7, 2022, McNutt signed a release agreement under which he agreed to surrender his ownership interest in Geosyn and its affiliates.

47.     In December 2022, Ward voluntarily contacted criminal authorities to report that McNutt had embezzled funds from Geosyn without disclosing his own misappropriations.

48.     The week before Christmas 2022, Ward terminated all but two Geosyn employees, retaining his personal assistant and another employee who assisted with operating the mining machines. Having failed to pay electricity costs, Ward was forced to abandon the Magnolia Location and to move all of Geosyn's operations to the Springtown Location. According to Geosyn's bank records, on December 27, 2022, Geosyn had a balance of only approximately $1,874.

49.     Despite Geosyn's dire financial straits, Ward continued some form of operations into 2023. Around the start of 2023, Ward began emailing investors "IOUs," noting that the investors were owed bitcoin distributions that Geosyn would pay later. Ward also sent emails to investors claiming that there were operational hiccups due to "malfeasance," difficulties procuring electricity, and struggles with upgrading power systems. As Geosyn's prospects of recruiting new investors dwindled, Ward frantically sought outside funds to keep Geosyn operating.

50.     While Geosyn was faltering, several investors demanded to take possession of the mining machines they purchased through Geosyn. One such investor ("Investor A") had contracted with Geosyn for the purchase of 90 mining machines. Geosyn never purchased those mining machines, and instead sent Investor A mining machines that belonged to an unrelated investor. When Investor A arranged to pick up 51 additional mining machines from the Springtown Location that he had previously procured himself and contracted with Geosyn to

host, he discovered that the 51 mining machines were still in their original packaging.

51. On May 25, 2023, the Springtown Location's landlord locked-out Ward and Geosyn due to non-payment of rent.

52. On June 1, 2023, Ward emailed the investors to state that Geosyn would file for bankruptcy, an event that never transpired.

## FIRST CLAIM FOR RELIEF

**Geosyn, Ward, and McNutt violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

53. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

54. By engaging in the conduct described herein, each Defendant, directly or indirectly, singly or in concert, by the use of the means or instrumentalities of interstate commerce and/or by use of the mails, in connection with the purchase or sale of securities, has: (a) employed a device, scheme, or artifice to defraud; and/or (b) made an untrue statement of a material fact, or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon purchasers, prospective purchasers, and any other persons.

55. Each Defendant acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness.

56. By reason of the foregoing, each Defendant has violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**Geosyn, Ward, and McNutt violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]**

57. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

58. By engaging in the conduct described herein, each Defendant, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce and/or by use of the mails, has: (a) employed a device, scheme, or artifice to defraud; and/or (b) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

59. With regard to the Defendants' violations of Section 17(a)(1) of the Securities Act, the Defendants acted with scienter and engaged in the referenced acts knowingly and/or with severe recklessness. With regard to the Defendants' violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, the Defendants acted at least negligently.

60. By reason of the foregoing, each Defendant has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q].

## THIRD CLAIM FOR RELIEF

**Geosyn, Ward, and McNutt violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) & (c)**

61. The SEC re-alleges and incorporates by reference each and every allegation contained in the paragraphs above.

62. By engaging in the conduct described above, each Defendant, directly or

indirectly, singly and in concert with others, has: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement was in effect; and/or (b) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by the means or instruments of transportation, securities as to which no registration statement was in effect; and/or (c) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, through the use or medium of any prospectus or otherwise, securities as to which no registration statement has been filed.

63.    By reason of the foregoing, each Defendant violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77(e)(c)].

**RELIEF REQUESTED**

Therefore, the SEC respectfully requests that this Court:

(a)    Permanently enjoin each Defendant from violating, directly or indirectly, Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b)    Permanently restrain and enjoin Ward and McNutt from participating, directly or indirectly, including, but not limited to, through any entity controlled by either of them, in any offering of securities, including any crypto asset security; provided, however, that such injunctions shall not prevent them from purchasing or selling securities, including any crypto asset security, for their own personal accounts;

(c)    Permanently bar Ward and McNutt from serving as an officer or

director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

  (d) Order Ward and McNutt to each disgorge his ill-gotten gains, plus prejudgment interest on those amounts, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

  (e) Order Ward and McNutt to each pay a civil penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

  (f) Impose such other and further relief as the Court may deem just and proper.

Dated: April 24, 2024       Respectfully submitted,

              *s/ Jennifer D. Reece*
              Jennifer D. Reece
              Texas Bar No. 00796242
              Robert J. Boudreau
              Texas Bar No. 24123473
              SECURITIES AND EXCHANGE COMMISSION
              Fort Worth Regional Office
              801 Cherry Street, Suite 1900
              Fort Worth, TX  76102
              Phone: (817) 978-6442 (JDR)
                 (817) 978-0165 (RJB)
              Fax: (817) 978-4927
              *reecej@sec.gov*
              *boudreauro@sec.gov*

              ATTORNEYS FOR PLAINTIFF
              SECURITIES AND EXCHANGE COMMISSION