

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CALEB WARD (01)<br>JEREMY MCNUTT (02)<br>JARED MCNUTT (03) | No. 4:25-MJ-086 |

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
FEB - 5 2025
CLERK, U.S. DISTRICT COURT
By_____
Deputy

## CRIMINAL COMPLAINT

I, Special Agent Blake Thomas, being duly sworn, depose and state the following is true and correct to the best of my knowledge and belief:

### ALLEGED OFFENSE: WIRE FRAUD CONSPIRACY

From in or about February 2022 through in or about May 2023, in the Fort Worth Division of the Northern District of Texas, and elsewhere, defendants **Caleb Ward, Jeremy McNutt,** and **Jared McNutt** (the "Defendants"), along with others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, that is, to devise and intend to devise a scheme and artifice to defraud and to obtain property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the scheme and artifice, transmitted and caused to be transmitted by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, all in violation of 18 U.S.C. § 1349.

### INTRODUCTION AND AGENT OVERVIEW

1. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

**EXHIBIT B**

2.      I am employed as a Special Agent with the Federal Bureau of Investigation (FBI), Department of Justice, and have been so employed since July 31, 2022. As an FBI Special Agent, I have investigated numerous fraudulent schemes including investigations involving wire and mail fraud schemes, and securities fraud. During my tenure as an FBI Special Agent, I have worked mostly financial crimes investigations, and have participated in all the normal methods of investigation, including, but not limited to: electronic surveillance, visual surveillance, interviews of witnesses, the execution of search warrants, the use of confidential informants and cooperating witnesses, and the use and analysis of pen registers. I am vested with the authority to investigate violations of Federal laws, including Titles 18 and 26 of the United States Code.

3.      The facts set forth in this Affidavit are based upon my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses. Because this affidavit is being submitted for the limited purpose of supporting the issuance of a criminal complaint and arrest warrant for the defendant, I have not set forth in this affidavit everything that I have learned as a result of this investigation. Rather, I have set forth only those facts I believe are necessary to establish probable cause that a violation of federal law has been committed.

4.      Based on my training, experience, participation in this investigation, and the facts as set forth in this affidavit, there is probable cause to believe that the **Defendants** have violated 18 U.S.C. § 1349 (wire fraud conspiracy).

# PROBABLE CAUSE

## Background Information

5.  At all times relevant to the conspiracy and scheme to defraud:

6.  Bitcoin is a type of cryptocurrency that exists virtually and not in any physical form. An individual can receive newly created bitcoin as a reward for "mining"—contributing computing power to verify and record bitcoin transactions. Bitcoin mining typically requires specialized computers, called "miners," and consumes a large amount of electricity. Individuals can pool their miners to increase the overall computing power, with any bitcoin earned being distributed based on each miner's contribution to the pool.

7.  Geosyn Mining, LLC and related Geosyn entities (collectively, "Geosyn") had their principal place of business in the Northern District of Texas, with primary locations in Fort Worth and Springtown. Geosyn's primary business was the operation of a bitcoin mining pool facility.

8.  Defendant **Caleb Ward** was the co-founder and Chief Executive Officer of Geosyn.

9.  Defendant **Jeremy McNutt** was the co-owner and the Chief Operating Officer at Geosyn. **McNutt** resigned from Geosyn in October 2022.

10. Defendant **Jared McNutt** was a sales manager at Geosyn. **Jared McNutt** resigned from Geosyn in October 2022.

11. Individuals and entities who agreed to contribute bitcoin miners to Geosyn's mining pool were called "clients." Although Geosyn told clients that their miners would be housed in Geosyn facilities, Geosyn made clear that clients retained ownership of their miners.

12. Clients could either send their own miners to Geosyn and pay a fixed setup fee per miner, or clients could agree to have Geosyn purchase miners for the client in exchange for a procurement fee. The **Defendants** told clients that this fee covered all costs associated with the acquisition, installation, and set up of the client's miners, and that the rest of the client's funds would be used to purchase miners.

13. In exchange for Geosyn providing hosting and management services, clients agreed to pay Geosyn a monthly service fee in the form of a percentage of bitcoin earned. Clients also agreed to pay the electricity costs of their machines.

14. **Ward** and **Jeremy McNutt** were listed as signers and maintained the First Financial Bank account no. xxx4795 ("FFB-4795"), in the name of Geosyn Mining, LLC, opened on or about March 10, 2022.

## Purpose of the Conspiracy and Scheme ot Defraud

15. The purpose of the conspiracy and scheme was to deceive current and potential clients and investors to induce (1) potential clients to purchase miners through Geosyn and (2) current clients not to withdraw from Geosyn's mining pool.

## Manner and Means of the Conspiracy and Scheme to Defraud

16. The manner and means by which the **Defendants** and their coconspirators sought to accomplish the purpose of the conspiracy and scheme included, among other things:

*Misrepresenting that clients' miners would be purchased or had been purchased*

   a. In or about June 2022, the **Defendants** began misrepresenting to clients that miners would be purchased with the clients' money when, in fact, the **Defendants** began using clients' money to cover other business and personal expenses. In

many instances, the **Defendants** never actually purchased the clients' miners. In order to keep clients from seeking to withdraw their money or miners from Geosyn, the **Defendants** sent out false distribution reports and payments to induce clients into believing that their miners were installed and earning bitcoin even when the **Defendants** knew that to be false. The **Defendants** and their coconspirators used money from new clients—which the new clients believed had been used to purchase their miners—to buy bitcoin and transfer it to the earlier clients without telling the earlier clients that their miners were not actually operating.

b. For example, on or about June 27, 2022, **Jeremy McNutt**, on behalf of Geosyn, entered a contract with Victim-1 to purchase two miners for $11,531, which Victim-1 would own and Geosyn would install in its facility. Although Victim-1 sent money for these miners to Geosyn's FFB-4795 account, the miners were never purchased and the **Defendants** spent the money on other things.

c. Similarly, on or about August 11, 2022, Victim-2 paid $340,000 to Geosyn's FFB-4795 account for what Victim-2 was led to believe was the purchase of 100 miners. These miners were never purchased and the **Defendants** spent the money on other things.

d. Similarly, on or about September 20, 2022, Victim-3 asked **Jared McNutt** about the status of miners Victim-3 had ordered. **Jared McNutt** replied, "Yes sir. You are up and running as of yesterday!" As **Jared McNutt** knew, however, Victim-3's miners had not even been ordered yet. Then, on or about September 27, 2022,

Ward sent Victim-3 falsified distribution reports purporting to show Victim-3's earnings, leading Victim-3 to believe that his miners had been purchased and installed. Based on these misrepresentations, Victim-3 was induced into paying money for additional miners on September 30, 2022. The **Defendants** never purchased these miners, either, and again spent the money on other things.

e. At the time that **Jeremy McNutt** and **Jared McNutt** left Geosyn in October 2022, clients had paid Geosyn approximately $1,013,850 for approximately 274 miners that had not been purchased.

f. After **Jeremy McNutt** and **Jared McNutt** left Geosyn, **Ward** and other coconspirators continued to misrepresent to clients that their miners had been purchased when, in reality, the clients' money had been spent on other things. For example, on or about October 28, 2022, **Ward** induced Victim-4 to pay $344,000 purportedly to purchase 90 miners and install 51 of Victim-4's miners that Victim-4 already owned. Instead of buying the new miners or installing the other ones, as promised, **Ward** used the money to pay for other things, including paying off an earlier client and making payments on Geosyn's credit card bill. In January 2023, **Ward** falsely told Victim-4 that the miners had been purchased. By February 2023, Victim-4 began trying to retrieve all his miners, including the ones **Ward** led him to believe had been purchased. In response, **Ward** again falsely represented to Victim-4 that the miners had been purchased. In April 2023, **Ward** agreed to return the machines Victim-4 believed had been purchased for him. In reality, however, the machines **Ward** gave to Victim-4 belonged to

Victim-5, unbeknownst to either victim. **Ward** never told Victim-5 that 90 of his miners were given to another client, leading Victim-5 to believe that his miners were still in Geosyn's custody.

*Misrepresenting the actual cost of miners*

g. Although the **Defendants** and their coconspirators told potential clients that Geosyn would only charge 13-15% above Geosyn's cost to acquire mining machines, at times the **Defendants** would lie to potential clients about the cost of the machines in order to reap additional profits for themselves.

h. For example, in February 2022, **Ward** told Victim-6 that, out of a $100,000 purchase of miners, $85,000 would go towards purchasing the miners direct from the manufacturer and the other 15% to Geosyn. On or about February 13, 2022, **Jeremy McNutt** signed a contract on behalf of Geosyn agreeing to purchase 12 miners for approximately $101,500. In fact, **Ward** and **Jeremy McNutt** had lied to Victim-6 about the price of miners and had spent only around $70,000 on miners, pocketing the difference.

i. Similarly, on or about September 29, 2022, **Jared McNutt** sent **Ward** and **Jeremy McNutt** a spreadsheet containing the real prices they were paying for miners, as well as inflated prices well above the stated 13-15% procurement fee that they would show to potential clients. The spreadsheet had a column showing the exact amount of upcharge Geosyn was charging clients without their knowledge. **Jared McNutt** also included a separate spreadsheet for Geosyn to send to clients showing the inflated prices.

j. Additionally, after **Jeremy McNutt** and **Jared McNutt** left Geosyn, **Ward** and others continued to lie about the cost of miners. For example, on or about December 1, 2022, Victim-5 paid Geosyn $330,000 for 120 miners, which **Ward** led Victim-5 to believe included only the 15% procurement fee. In fact, **Ward** had lied to Victim-5 about the cost of the miners, causing **Ward** to reap over $100,000 in fraudulent proceeds.

17. The **Defendants** used client money to fund their lavish lifestyles. For example, in June 2022, **Jeremy McNutt** spent over $15,000 on luxury watches. In July, **Ward**, **Jeremy McNutt**, and **Jared McNutt** took a trip to Miami, purportedly for a conference. In the evenings, however, they ran up thousands of dollars in restaurant and night club charges on Geosyn credit cards. In August, **Ward** and **Jeremy McNutt** took over a dozen of their family members to Disney World, also charging the expenses to Geosyn credit cards. In or about August 2022, the **Defendants** used client funds to pay the credit card bills, instead of purchasing client machines, as promised. In September, **Jeremy McNutt** used the Geosyn credit card to purchase over $7,000 worth of guns for himself, and then tried to cover it up by lying to a Geosyn employee who questioned the purchase. And in or about October 2022, **Ward** and **Jeremy McNutt** took a trip to Las Vegas for **Ward** to get married. **Ward** took $10,000 in client money from Geoysn's FFB-4795 account, and **Jeremy McNutt** used a Geosyn credit card to run up over $17,000 in night club bills in one night, which was paid back using client funds.

## CONCLUSION

18. Based upon the foregoing facts and information, there is probable cause to believe that **Caleb Ward, Jeremy McNutt**, and **Jared McNutt** along with others known and unknown, did knowingly and willfully combine, conspire, confederate, and agree to violate 18 U.S.C. § 1343, in violation of 18 U.S.C. § 1349.

*[signature]*
Blake Thomas
Special Agent
Federal Bureau of Investigation
Department of Justice

SWORN AND SUBSCRIBED before me on this 5th day of February, 2025.

*[signature]*
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE